**In re CONTROL ELECTRIC, INC., Debtor(s).**

**John W. RAGSDALE, Jr., Trustee, Plaintiff,**

v.

**The CITIZENS AND SOUTHERN NATIONAL BANK, Defendant.**

**Bankruptcy No. A85–02607–MHM. Adv. No. 87–0255A.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Sept. 29, 1988.

John W. Ragsdale, Jr., Ragsdale, Beals, Hooper & Siegler, Atlanta, Ga., for plaintiff.

Gerald L. Blanchard, C & S Legal Dept., Atlanta, Ga., for defendant.

ORDER

MARGARET H. MURPHY, Bankruptcy Judge.

This Chapter 7 case was commenced on May 20, 1985, and the adversary proceeding was filed on May 15, 1987 by the Trustee to recover allegedly preferential payments made by Debtor to Defendant. Defendant contends the payments fall within the "ordinary course of business" exception of 11 U.S.C. § 547(c)(2). The parties have filed cross motions for summary judgment. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).

Bankruptcy Rule 7056, based on F.R.C.P. Rule 56, provides that summary judgment should be granted if "there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." The parties have submitted a joint stipulation of facts.

Debtor is an electrical subcontractor involved in the business of providing electrical materials and services at construction projects. Debtor regularly purchased ma-

terials from trade creditors on terms which provided for payment in full within 30 days of invoice. Debtor obtained the loan at issue for $30,000.00 in February, 1983, for long term working capital to be repaid from the cash generated by net profits of Debtor. As payments on the loan were made by automatic debit to Debtor's checking account, such payments were made regularly for the two years prior to the Debtor's filing its Chapter 7 petition. Three such debits occurred within 90 days preceding the filing of Debtor's bankruptcy petition.

DISCUSSION

Pursuant to 11 U.S.C. § 547(b), the Trustee may avoid any transfer of an interest of the debtor in property:

(1) To or for the benefit of a creditor;

(2) For or on account of an antecedent debt owed by the Debtor before such transfer was made;

(3) Made while the debtor was insolvent;

(4) Made—

(A) On or within 90 days before the date of the filing of the petition; or

(B) Between 90 days and 1 year before the date of filing of the petition, if such creditor at the time of such transfer was an insider, and

(5) That enables such creditor to receive more than such creditor would receive—

(A) The case where case under Chapter 7 of this Title;

(B) The transfer had not been made; and

(C) Such creditor received payment of such debt to the extent provided by the provisions of this Title

The parties stipulate that all the above elements of a preference exist in the instant case.[1]

Section 547 provides several exceptions to the Trustee's power to avoid a preferential transfer. In the instant case, Defendant relies on the exception set forth in § 547(c)(2), which provides that the Trustee may not avoid a preferential transfer to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made accordingly to ordinary business terms[.]

Pursuant to 11 U.S.C. § 547(g), the creditor against whom recovery or avoidance is sought has the burden of proving the nonavoidability of the transfer under subsection (c).

The parties do not dispute the existence of the second and third elements of the § 547(c)(2) exception described above. The parties agree that the payments, made by automatic debit from Debtor's checking account, were made in the ordinary course of business or financial affairs of Debtor and the transferee. The parties also agree that the loan by Defendant to Debtor was made according to ordinary business terms.

As to the first element of the § 547(c)(2) exception, there is little doubt that making long-term loans such as the one in the instant case is within the ordinary course of business of a bank like Defendant. *Aguillard v. Bank of LaFayette, (In re Bourgeois),* 58 B.R. 657 (W.D.La.1986) (hereinafter *"Bourgeois"*). Therefore, the sole issue before this Court is whether the long-term loan was incurred by Debtor in the ordinary course of the business or financial affairs of Debtor. Although incurring a long-term loan to provide working capital is not "ordinary" in the sense that it occurs frequently, it is "ordinary" in the sense that incurring such debt occasionally during its lifetime is not unusual for most

1. Debtor's loan was unsecured. Payments made on debts which are fully secured would not be subject to turnover because the creditor would not have received more than he would have received in a Chapter 7 case. On the other hand, an under-secured creditor could be subject to turnover because the preferential payment would be applied to the unsecured portion of the debt, thus enabling the creditor to receive more than he would in a Chapter 7 case. *Barash v. Public Finance Corp.,* 658 F.2d 504 (7th Cir.1981).

businesses. *Contra, Bourgeois,* 58 B.R. 657 and see discussion, *infra.*

Unfortunately, the Code provides no statutory definition of "ordinary course of business or financial affairs" which might provide a quick resolution of these issues. Additionally, although one might expect a great deal of litigation over such ambiguous terms, very little case authority defines these terms. Prior to the Bankruptcy Amendment and Federal Judgeship Act of 1984, the § 547(c)(2) exception contained an element which required that the transfer be made not later than 45 days after such debt was incurred.[2] The bulk of the litigation to date involving § 547(c)(2) concerns this 45-day limitation.

In the Bankruptcy Amendment and Federal Judgeship Act of 1984, Congress deleted the 45-day limitation contained in § 547(c)(2). Because little legislative history or comment accompanies the 1984 amendment, it is unclear how Congress intended the deletion to affect application of the § 547(c)(2) exception to long-term loans. An examination of the statutory history, scholarly commentary, the Congressional policies behind the preference section, and case law sheds light on Congressional intent behind the elimination of the 45-day limitation.

## STATUTORY HISTORY

The doctrine of preferences had its beginnings early in Anglo-American law. Originally, preferential transfers were lawful. 3 *Collier on Bankruptcy* ¶ 60.04, p. 767 (14th ed. 1964). With the advent in 1623 of the concept of *pro rata* distribution to creditors, however, giving preferences was made criminal. The debtor who gave a preference was likely to lose one of his ears and to spend two hours in the pillory as a public warning to others. It was not until 1869, however, that the English bankruptcy statute made giving preferences a private rather than a public wrong and permitted recovery of preferential payments from creditors rather than debtors. *Id.*

In the United States, the Bankruptcy Act of 1898 provided for the avoidance and turnover of preferences. Section 60(b) of the Bankruptcy Act provided that the Trustee could avoid a preferential transfer if the creditor receiving the transfer had, at the time the transfer was made, "reasonable cause to believe that the debtor [was] insolvent." 11 U.S.C. § 96(b). Although the Act provided no statutory exceptions to the preference law, several exceptions were judicially created, including one which provided that payments of current expenses were not preferences. 3 *Collier on Bankruptcy* ¶ 60.23 (14th ed. 1974).

When enacting the Bankruptcy Reform Act of 1978, Congress eliminated the "reasonable cause to believe" requirement. Additionally, the Bankruptcy Reform Act of 1978 codified the judicially-created exceptions to preference law, including the exception for ordinary course of business transactions. In formulating the exception in 1978, Congress settled on the 45-day limitation because it perceived that 45 days reflected the typical billing cycle of transactions intended to fall within the exception. *Bourgeois,* 58 B.R. at 659.

Prior to the 1984 amendments, the 45-day limitation precluded long-term loans from coming within the § 547(c)(2) exception. For the purposes of computing the 45 days from the date the debt was incurred in a case involving a long-term loan, the debt was determined to have been incurred on the date the debtor first became legally obligated to pay, rather than on the date each installment payment was due. *Barash v. Public Finance Corp.,* 658 F.2d 504 (7th Cir.1981). Excepting payments made within 45 days of the date the debt was incurred was intended to be an extension of the § 547(c)(1) provision which excepts transfers intended to be "a contemporaneous exchange for new value." *Bourgeois,* 56 B.R. at 659.

2. "The trustee may not avoid under this section a transfer ... to the extent that such transfer was ... made not later than 45 days after such debt was incurred[.]" 11 U.S.C. § 547(c)(2)(B) (1978).

As mentioned above, in the 1984 amendments, Congress deleted the 45-day limitation in § 547(c)(2). The 45-day limitation had been the subject of numerous complaints by consumer lenders, trade creditors, and commercial paper issuers.[3]

Consumer lenders argued that the installment payments on a consumer debt could seldom fit within the 45-day limitation but that the amounts recovered by the Trustee were usually sufficient to pay only the administrative expenses of the recovery. *Broome,* 1987 Duke L.J. 78. In answer to the consumer lenders' complaint, Congress enacted, in 11 U.S.C. § 547(c)(7), a new exception for avoidance of transfers involving consumer debts of less than $600. *Id.*

Trade creditors complained the trade credit periods in many industries were longer than 45 days. *Id.* For commercial paper issuers, the 45-day limitation resulted in artificially shortening the maturity dates of commercial paper, which in turn resulted in a decrease in access to the commercial paper market for companies which refused to issue commercial paper for such a short term. *Id.* In answer to the complaints of trade creditors and commercial paper issuers, Congress eliminated the 45-day limitation. *Id.* Although long-term lenders had not been vocal in seeking a change in preference law which would insulate them from avoidance of installment payments made within the preference period, the elimination of the 45-day limitation removed the primary obstacle which excluded long-term loans from the § 547(c)(2) exception.

Accordingly, it would appear that elimination of the 45-day limitation brought long-term loans within the scope of the § 547(c)(2) exception. Unfortunately, however, the conclusion is synthetic and, while facially appealing, belies an incomplete analysis. No legislative history, by way of Congressional comment, exists which clearly allows such a facile conclusion. *Id.* A review of scholarly commentary, Congressional policy, and case law interpreting the 1984 amendments necessarily follows.

## SCHOLARLY COMMENTARY

Several commentators conclude that the elimination of the 45-day limitation *ipso facto* results in the inclusion of long-term debt within the ordinary course of business exception.[4] In reaching their conclusions, commentators alternately approve and disapprove of this result. One commentator states that the inclusion of long-term debt within the § 547(c)(2) exception results in an exception which swallows the rule.[5] Another, however, states that excepting regular monthly payments on a long-term installment loan preserves normal financial relations and is consistent with the policies behind the section.[6] Another scholar notes, without expressing an opinion on the effect on long-term loans, that the deletion of the 45-day limitation will, of necessity, result in courts focusing on the definition of "ordinary course of business or financial affairs." [7]

One commentator advocates the conclusion that § 547(c)(2) should be read expansively so as to include payments made pur-

3. *See,* Broome, *Payments on Long-Term Debt as Voidable Preferences: The Impact of the 1984 Bankruptcy Amendments,* 1987 Duke L.J. 78 (1987), for an excellent discussion of the sparse legislative history for the 1984 amendments.

4. Morris, *Substantive Consumer Bankruptcy Reform in the Bankruptcy Amendments Act of 1984,* 27 Wm. & Mary L.Rev. 91 (1985); Herbert, *The Trustee Versus the Trade Creditor II: The 1984 Amendment to Section 547(c)(2) of the Bankruptcy Code,* 2 Bankr.Dev.J. 201 (1985); DeSimone, *Section 547(c)(2) of the Bankruptcy Code: The Ordinary Court of Business Exception Without the 45 Day Rule,* 20 Akron L.Rev. 95 (1986); Weintraub and Resnick, *Preferential Payment of Long-Term Debts in the Ordinary Course of Business—The Effect of the 1984 Amendments,* 17 U.C.C.L.J. 263 (1985).

5. Duncan, *Loan Payments to Secured Creditors as Preferences Under the 1984 Bankruptcy Amendments,* 64 Nebr.L.Rev. 83 (1985).

6. Weintraub and Resnick, *Preferential Payment of Long-Term Debts in the Ordinary Course of Business—The Effect of the 1984 Amendments,* 17 U.C.C.L.J. 263 (1985).

7. Gorney, *Elimination of the 45-Day Rule: Amendment of Section 547(c)(2) Requires a New Look at Preferences,* 91 Com.L.J. 364 (1986).

suant to the terms of a workout.[8] The author urges adoption of an "ordinary under the circumstances" standard which would include terms and methods of payment typically used by parties to a workout. That author stresses that the emphasis should be on furthering the larger purpose of the preference section, to encourage attempts to preserve and strengthen the estate, rather than to dismember it and violate equality of distribution.

Following an in-depth analysis of the legislative history and Congressional policies underlying the preference section, one scholar, Broome, concludes that the ordinary course of business exception should not be read to protect payments on long-term loans.[9] Broome concludes that through § 547(c)(2), Congress intended to encourage creditors to engage in ordinary (i.e., short-term and trade credit) transactions with Debtor in the hope that the debtor might prevent his slide into bankruptcy. Broome suggests that this Congressional intent offers the means by which to distinguish between the type of debt protected by § 547(c)(2) and the type of debt not so protected. To a short-term creditor approached by a financially troubled debtor, the risk of the debtor filing bankruptcy within 90 days of payment is a significant risk because payments made during that 90 day period could represent most if not all of the debt. If the § 547(c)(2) exception is unavailable, the knowledgeable creditor may choose not to deal with the Debtor, rather than accept the risk of regurgitating the payments later. On the other hand, for example, when a creditor contemplates making a loan to be repaid in monthly payments over five years, the possible avoidance of 2 or 3 payments out of 60 does not present a significant risk of loss.

Broome further postulates that excluding long-term loans from the protection of § 547(c)(2) might further the goal of preventing Debtor's bankruptcy. If the creditor is faced with avoidance of Debtor's payments on its long-term loan, the creditor has incentive to work with Debtor to help Debtor overcome his financial difficulties. If payments on the long-term debt are protected, however, the creditor may insist on its payments to the detriment of Debtor's attempts to work through its financial difficulties.

Broome recognizes that no bright line definition of long-term versus short-term credit exists but acknowledges that such lines are drawn routinely by other entities such as accountants and the Internal Revenue Service. The author advocates against limiting application of § 547(c)(2) only to trade debt because such a limitation might discourage debtors from seeking and obtaining the least expensive financing. She concludes:

> The legislative history of the ordinary course of business exception and the policies underlying it suggest an appropriate limiting principle: the exception only protects payments on debts incurred in the ordinary course of the debtor's business, and only short-term debt incurred to finance the debtor's current operations—that is, debt to be repaid in the normal operating cycle of the debtor—may be deemed incurred in the ordinary course.

Broome, *Payments on Long-Term Debt as Voidable Preferences: The Impact of the 1984 Bankruptcy Amendments,* 1987 Duke L.J. 78 (1987) at page 122.

Legal scholars present no consensus as to the effect of elimination of the 45 day limitation on long-term loans. Consequently, lacking both consensus and a clear Congressional intent, a conclusion concerning application of § 547(c)(2) to long-term loans must rely primarily on an analysis of Congressional policy relating to the preference section and the § 547(c)(2) exception.

## CONGRESSIONAL POLICY

The stated purpose of the preference section is to "facilitate the prime bankruptcy

8. Herbert, *The Trustee Versus the Trade Creditor II: The 1984 Amendment to Section 547(c)(2) of the Bankruptcy Code,* 2 Bankr.Dev.J. 201 (1985).

9. Broome, *Payments on Long-Term Debt as Voidable Preferences: The Impact of the 1984 Bankruptcy Amendments,* 1987 Duke L.J. 78 (1987).

policy of equality of distribution among creditors" and to discourage "a race to the courthouse to dismember the debtor during his slide into bankruptcy." House Report 95–595, 95th Cong., 1st Session, 177–78, U.S.Code Cong. & Admin.News, pp. 5787, 6137–39 (1978). With respect to 547(c)(2) and long-term debt, application of these two facets of the purpose results in equipoise. Preference avoidance and return to the Chapter 7 trustee of the last three of many automatic-debit monthly payments made to the bank facilitates equality of distribution among creditors. On the other hand, the method of payment utilized in the instant case does not appear, to be the result of actions which, by their nature, should be prevented for policy reasons; automatic payment appears to be neither a race to the courthouse nor the dismemberment of the debtor during his slide into bankruptcy.

If several or a majority of the debtor's creditors, however, obtained timely payment by automatic account debit, as utility (power, telephone) and other companies are beginning to encourage, then it becomes less difficult to recognize that a subjective analysis of what constitutes a race or dismemberment will tend to favor the institutions having the leverage with which to obtain automatic-debit payments. In a few years, the ability of some creditors to obtain payment on recurring monthly debts by automatic debit could result in a focus, as a matter of policy, on whether the creditors who are able to obtain their payments with such ease and monthly certainty should be favored over those who did not or could not employ such a facile collection method.

If payments by automatic debit are excepted pursuant to § 547(c)(2), then the automatic-debit creditor benefits doubly: not only are the last 3 monthly (i.e., preference-period) payments retained, but the regular payments received in the pre-preference slide into bankruptcy, when other creditors are likely to receive sporadic or less-than-prompt payments, are also retained by the foresighted creditor. That is, even without consideration of the preference-period payments, the automatic-debit creditor is already likely to have received more payments than his ordinary-collection method competitor. If the foresighted and able or powerful creditors are so favored, the policy of pro-rata distribution is then clearly undermined.

Scholars argue that the elimination in the Bankruptcy Code of the "reasonable cause to believe" requirement evidenced a shift in Congressional focus—on preference policy, at least—from subjective standards to objective standards. Consequently, that focus also shifted from a policy of deterrence toward equality of distribution.[10] The shift from the Act's subjective standards to the Code's objective standards results in an ability to recover preferences without regard to the creditor's knowledge of a debtor's solvency. If scienter is irrelevant, then deterrence occurs, if at all, not as a goal of preference law but as a byproduct of the policy.[11]

Congress perceived, however, that avoidance of certain kinds of transactions would not foster the purpose of the preference section. The stated purpose of the ordinary course of business exception to the Trustee's avoidance power was to leave undisturbed "normal" financial relations. House Report 95–595, 95th Cong., 1st Session, 373–74, U.S.Code Cong. & Admin. News, pp. 6329, 6330 (1978). An exception allowing such "usual" activity does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy. *Id.*

The meshing of the purpose of the preference section, equality of distribution, with the purpose of the ordinary course of business exception, permitting continuation of normal financial relations of debtor,

**10.** Broome, *Payments on Long-Term Debt as Voidable Preferences: The Impact of the 1984 Bankruptcy Amendments,* 1987 Duke L.J. 78 (1987); Duncan, *Loan Payments to Secured Creditors as Preferences Under the 1984 Bankruptcy Amendments,* 64 Nebr.L.Rev. 83 (1985).

**11.** Such deterrence is far removed from loss of an ear.

sheds some light on Congressional intent in deleting the 45-day limitation. The purpose of § 547(c)(2) is to encourage creditors to continue dealing normally with the debtor rather than taking extraordinary actions which might precipitate or accelerate the debtor's slide into bankruptcy. *Morris v. United States,* 53 B.R. 190 (Bankr.Ore. 1985). Thus, whereas short-term trade debt and even refinancing arrangements within the context of a workout would legitimately fall within the § 547(c)(2) exception, long term debt undertaken prior to the onset of debtor's financial difficulties would not foster this purpose. Furthermore, in the case of a long-term debt incurred before the onset of financial difficulties, it is unlikely the lender was influenced by the possibility of its payments being protected by the § 547(c)(2) exception. Even if the effect of the exception were considered by the lender, the retention or non-retention of only two or three monthly payments is unlikely to have been a significant factor in the decision to extend to a debtor a loan in which the term exceeds several years. In the context of trade debt or a workout arrangement, however, the benefit to the estate is immediate and, in proximity to the credit extended, recent. The benefit of a long-term unsecured installment loan, usually given 12 or more months prior to filing, is absorbed by debtor over a much longer term than the period upon which the (c)(2) exception focuses.

Excepting payments on long-term loans pursuant to § 547(c)(2) would signal a significant shift in the Congressional policy in preference law which favors equality of distribution among similarly situated creditors. An exception which prevents avoidance by the Trustee of preference payments on long-term debt, as well as preference payments on short term debt, neutralizes the effect of the preference section by excepting almost every kind of payment which a debtor might choose to make during the preference period. The lack of legislative history accompanying the amendment to § 547(c)(2) indicates no such policy shift was intended.

CASE LAW

Few cases have yet been decided construing § 547(c)(2) following the deletion of the 45-day limitation. The extant case law, however, tends to disfavor inclusion of payments on long-term loans in the exception for ordinary course of business. In *Bourgeois,* 58 B.R. 657, the court concluded that the deletion of the 45-day limitation was not intended by Congress to extend the ordinary course of business exception to payments on long-term loans:

> To hold such payments on long term loans to be in the ordinary course of business within the meaning of section 547(c)(2) would be to flout the clear intent of that subsection, and the entire policy of the preference section as a whole. Such a holding would virtually denude the preference provisions of the Code of any meaning at all.

*Bourgeois,* 58 B.R. at 660. The *Bourgeois* court concluded that payments made on long-term loans do not meet the requirements of § 547(c)(2) because excepting such payments would foster none of the perceived Congressional policies for the ordinary course of business exception. *Id.*

The reasoning in *Bourgeois* was followed in the case of *Gosch v. Burns* (*In re Finn*), 86 B.R. 902, 17 B.C.D. 896 (E.D. Mich.1988). The court in *Finn* rested its decision on an analysis of the § 547(c)(2)(A) requirement that the debt must be *incurred* in the ordinary course of business of the debtor and the transferee. The *Finn* court held that long-term debt was not within the ordinary course of the debtor's financial affairs even though it was within the ordinary course of the business of the transferee.

In the case of *In re Magic Circle Energy Corporation,* 64 B.R. 269 (Bankr.W.D. Okla.1986), the debtor, as part of a workout, executed a long-term installment note to pay for services which had been rendered to it on a one-time repair job. The court held that because the underlying debt was incurred in the ordinary course of business, the mere restructuring of the payment terms failed to alter the character of the debt. *Id.* at 273. Excepting payments

The court in the case of *Courtney v. Octopi, Inc.* (*In re Colonial Discount Corp.*), 807 F.2d 594 (7th Cir.1986), held payments on long-term loans were within the ordinary course of business exception. In that case, however, the debtor's business, buying and selling real estate, necessarily resulted in fewer transactions attaching to much longer time frames than could be expected with a more liquid form of inventory. Thus, incurring long-term debt with *Octopi* was in the ordinary course of debtor's business.

Only in the case of *Xonics Medical Systems, Inc. v. California Sunnyvale Associates*, Adversary No. 85 A 1096, slip op. (Bankr.N.D.Ill.1986), does support appear for the position that payments on a long-term loan are within the § 547(c)(2) exception. The *Xonics* case involved the debtor's long-term lease of real property used as debtor's place of business. The court stated:

> Indeed, this court would broaden the definitions of ["ordinary course of business" and "ordinary business terms"] suggested in *In re Bourgeois* [sic] for in this court's view one could, if the facts warrant, include the undertaking of long-term debt in the ordinary course of one's business. Some businesses must under-

take long-term debt to provide sufficient working capital, i.e., funds to meet current obligations as they arise to carry on the purposes of the business.

*Xonics*, slip op. This statement was, however, *dicta* because the court held the debtor's rental payments, which had been made late, were not made in the ordinary course of business of the debtor and transferee.

## CONCLUSION

Thus, in addition to the lack of consensus among the legal scholars, it appears from the paucity of case law on the subject that no consensus exists in the courts as to how the amended § 547(c)(2) should be applied to long-term loans. This court is persuaded, however, by the reasoning of the court in *Bourgeois* and the analysis of Ms. Broome.[13] Therefore, in the instant case, although the transfers which the Trustee seeks to avoid appears to come within the literal terms of the § 547(c)(2) exception, this court finds that those transfers were not of the type which Congress intended to be excepted from avoidance provisions of § 547(b). Accordingly, it is hereby

ORDERED that Plaintiff's motion for summary judgment is GRANTED. Defendant's motion is DENIED.

---

**12.** See, Herbert, *The Trustee Versus the Trade Creditor II: The 1984 Amendment to Section 547(c)(2) of the Bankruptcy Code,* 2 Bankr.Dev.J. 201 (1985), for an excellent discussion of why payments under a workout should fall within 11 U.S.C. § 547(c)(2), as amended in 1984.

**13.** Broome, *Payments on Long–Term Debt as Voidable Preferences: The Impact of the 1984 Bankruptcy Amendments,* 1987 Duke L.J. 78 (1987).