In re the **CIRCLE K CORPORATION, Circle K Convenience Stores, Inc., Circle K Management Company, Lar–Lin, Inc., First Circle Properties, Inc., Utotem, Inc., Utotem Markets of Arizona, Inc., U Totem of Alabama, Inc., U–Tote'M of Colorado Inc., U–Tote'M of Miami, Inc., Tic Toc Systems, Inc., Monterre Properties, Inc., Shop & Go, Inc., Circle K General, Inc., Circle K Hawaii, Inc., Combined Aviation Co., Charter Marketing Company (Connecticut), Charter Marketing Company, Mr. B's Oil Co., Inc., Mr. B's Food Mart, Inc., NPI Corporation, Old Colony Petroleum Company, Inc., New England Petroleum Distributors, Inc., and 44th Street & Camelback Limited Partnership, Debtors.**

**CITIBANK, N.A., as agent, Plaintiff,**

v.

**The CIRCLE K CORPORATION, et al., Defendants.**

**Nos. B–90–5052–PHX–GBN to B–90–5075–PHX–GBN. Adv. No. 91–892–GBN.**

United States Bankruptcy Court, D. Arizona.

June 30, 1992.

D.J. Baker, Weil, Gotshal & Manges, Houston, Tex., Harvey R. Miller, Weil, Gotshal & Manges, New York City, John J. Dawson, Streich Lang, Phoenix, Ariz., Tad R. Smith, Kemp, Smith, Duncan & Hammond, El Paso, Tex., for debtors.

Deborah M. Buell, Cleary, Gottlieb, Steen & Hamilton, New York City, Jared G. Parker, Johnston Maynard Grant & Parker, Phoenix, Ariz., for Official Unsecured Creditors' Committee.

Dawn Stoll Zeitlin, Dushoff, McCall & Zeitlin, Phoenix, Ariz., Steven E. Sherman, Shearman & Sterling, San Francisco, Cal., R. Paul Wickes, Shearman & Sterling, New York City, for Citibank, N.A.

Martin F. Brecker, Anderson Kill Olick & Oshinsky, P.C., James E. Millstein, Cleary, Gottlieb, Steen & Hamilton, New York City, for Official Committee of Debenture Holders.

William L. Novotny, Mariscal, Weeks, McIntyre & Friedlander, P.A., Phoenix, Ariz., Fred S. Hodara, Stroock & Stroock & Lavan, New York City, for Certain Senior Secured Noteholders.

Stephen D. Busey, Smith Hulsey & Busey, Jacksonville, Fla., for AFC Affiliates.

Thomas H. Allen, Office of the United States Trustee, Phoenix, Ariz.

## MEMORANDUM OF DECISION

GEORGE B. NIELSEN, Jr., Bankruptcy Judge.

Debtors and Citibank, N.A., as agent for a group of banks (the "Bank Group"), exe-

cuted a stipulation for use of cash collateral and adequate protection. This stipulation permitted debtors to use cash collateral generated by the sale of inventory in the ordinary course of their business.

On May 16, 1991, the Court approved an amended stipulation for use of cash collateral. Paragraph 2(e) provides that proceeds of perfected cash collateral received by debtors, "other than in the ordinary course of business," will be paid to the agent for application toward the interim debt.

The amended stipulation specifically provides debtors are to pay to the Bank Group:

> [N]et cash proceeds of ... Pre–Petition Collateral arising from ... sale of properties of ... Debtors located in Hawaii, (B) ... cash proceeds from return to ... Debtors by PRI International, Inc. of a deposit ... of $550,000, (C) the cash proceeds from return to ... Debtors of escrowed funds ... of $4 million in connection with ... amendment and assumption of certain leases known as the "Kathary Group Leaseback Leases", (D) all amounts ... paid in respect of the Pledged Debt, including, but not limited to, ... a note ... of $3 million made by McLane Convenience Foods, Inc. ... payable to Circle K, and (E) the net cash proceeds arising from ... assumption and assignment of ... the "Skybox License Agreement"....

Amended Stipulation at paragraph 2(e), p. 23, Docket 4, Exhibit B.

The amended stipulation provides debtors may use cash collateral to purchase inventory in the ordinary course of business, pay other ordinary course expenses, pay claims of reclamation creditors and pay professional fees. *Supra.* The latter provisions are subject to limitations not relevant here. The parties now dispute the meaning of their stipulation.

## I

Debtors believe the following additional facts are material:

1. The amended stipulation does not define when proceeds are realized outside of the ordinary course.

2. Although the amended stipulation states five specific categories of proceeds to pay to Citibank, it is silent as to real property proceeds and the tax refund.

3. During negotiation of the amended stipulation, debtors informed Citibank that restricting usable cash collateral to proceeds of inventory sold in the ordinary course was unacceptable. *See* Affidavit of Peter R. Roest, Docket No. 16 at p. 2. It was debtors' intention in negotiating the amended stipulation to expand the categories of usable cash collateral beyond inventory sold in the ordinary course.

4. A letter Mr. Roest wrote to bank counsel dated December 12, 1990, states the usable cash collateral should include: (1) proceeds from the sale of inventory in the ordinary course; (2) proceeds from sale of equipment in the ordinary course; (3) all other funds received by debtors in the ordinary course, including returns on invested cash, payments under leases and franchise agreements and any other funds debtors would normally receive in the ordinary course and would reasonably anticipate being able to use; and (4) any deposit refund and credit card reimbursement received in ordinary-course procurement. Docket No. 16, Exhibit A.

5. It was debtors' intention in negotiating the amended stipulation to pay only with proceeds of large-scale asset dispositions, such as the closing of all stores in a particular region or market. *See* Affidavit of Bart A. Brown, Jr., Docket No. 18, pp. 1–2.

6. It is necessary and usual for debtors to enter into transactions that do not occur on a daily basis. These include real property leases, equipment leases and supply contracts. *Supra,* p. 2.

7. Circle K has or will receive cash proceeds from sales or condemnations of realty subject to bank group liens. Affidavit of Jerry F. Lyndes, Docket No. 15, at ¶ 2.

8. It is the usual practice of debtors to file tax returns and other documents with

federal taxing authorities. *See* Affidavit of Michael Gibbons, Docket No. 20, p. 4.

9. On their 1990 consolidated tax return, debtors reported a net loss for fiscal year 1990 of $157 million. When carried back to the years 1988 and 1987, the loss eliminated taxable income and permitted a carryback of business credits. By applying the 1990 operating loss to earlier profitable years, debtors obtained refunds of approximately $17.5 million in fiscal 1991. *Supra,* pp. 3–4.

10. On their consolidated 1991 tax return, debtors reported a net operational loss for fiscal year 1991 of about $172.2 million. Debtors project they will incur a substantial net operating loss for fiscal 1992. During the ten year period beginning in fiscal year 1983 and ending with fiscal year 1992, debtors sustained net operating losses five times. The net operating losses incurred in fiscal year 1991 arose largely from the fact ordinary business expenses exceeded income. Of the $172.2 million net operating loss, approximately $23 million are restructuring charges. The remainder consists of operating losses. Gibbons Affidavit, *supra.*

11. Net operating losses incurred for fiscal year 1990 arose almost entirely from ordinary course expenses. Of the $157 million net operating loss, $18.3 million consists of restructuring charges. The remainder consists of operating losses. *Supra.*

12. Net operating losses incurred in fiscal year 1989 arose entirely from ordinary course expenses. *Supra.*

13. In fiscal year 1992, debtors are involved in 85 condemnation proceedings and settlements in lieu of condemnation. In fiscal year 1991, the total was 70. In fiscal year 1990, the total was 78, while in fiscal year 1989, the total was 82.

14. Debtors never had a policy of automatically replacing condemned stores or of earmarking proceeds of condemnations for acquisition of replacement stores. Brown Affidavit at p. 3.

Facts deemed material to Citibank include that from 1984 to 1988, debtors earned profits. The last previous tax refund received was in 1983 for $3,319,-639.00.

## II

The Court previously entered an order approving the sale of Store 8820, located in Kissimmee, Florida, to Exxon Corporation. That order provided net proceeds of sale should be segregated, remain subject to Citibank's lien and not be disbursed until issues were resolved. The sale of Store 8820 resulted in approximately $650,000. These proceeds were inadvertently paid by debtors to the Bank Group. Debtor also received, or will receive, cash proceeds from other sales or condemnations of realty.

In December 1990, debtors filed a motion to authorize property leasing in the ordinary course. The resulting order found that debtors, in the ordinary course, obtained and granted easements, closed stores, disposed of equipment, leased, bought, sold and renewed alcoholic beverage licenses, and entered into and terminated equipment leases. The order noted it was within debtors' ordinary course to negotiate and accept awards or payments in condemnation proceedings. Adversary Docket No. 40, Exhibit A.

## III

Citibank filed this adversary on September 24, 1991, seeking an order compelling debtors to follow the amended stipulation and remit tax refunds and real property proceeds for application toward the interim debt. Citibank alleged these proceeds were not within debtors' ordinary course of business.

Defendants answered and filed a counterclaim, which was later amended. Debtors seek a finding that the tax refund and real property proceeds are within the ordinary course. They further requested return of funds inadvertently paid to Citibank for Store 8820. Finally, debtors request relief from possible claims of the Internal Revenue Service for a return of the tax refunds. Debtors request that if the IRS establishes a claim for the refund

and the Court earlier ordered the refund paid to Citibank, that Citibank should be compelled to disgorge.

## IV

■ This litigation clearly involves interpretation of a contract. The first issue is whether the parol evidence rule precludes debtors from introducing evidence concerning intent in negotiating the amended stipulation. *See generally* B. RUSSELL, BANKRUPTCY EVIDENCE MANUAL, § 21 (1991–92).

■ The parol evidence rule pertains to oral testimony and informal writings tending to contradict or vary a single, final written instrument. RUSSELL, *supra,* § 21, at 64. The parol evidence rule does not apply to incomplete or ambiguous instruments. *Supra,* at 63.

■ Parol evidence is not admissible to show intent where the instrument is clear. However, it is admissible to determine which of two meanings was intended. *Supra,* § 23 at 70–71.

■ Under Arizona law, when contract language is unambiguous, the language is interpreted as written, without reference to extrinsic evidence. *McLane & McLane v. Prudential Insurance Co. of America,* 735 F.2d 1194, 1195 (9th Cir.1984); *Isaak v. Massachusetts Indemnity Life Ins. Co.,* 127 Ariz. 581, 584, 623 P.2d 11, 14 (1981). In the present case, the instrument appears complete on its face. However, the phrase "ordinary course of business" is not defined and is susceptible to more than one interpretation as applied to debtors' operations.

The Bank Group argues for a narrow interpretation. Creditors conclude "ordinary course of business" can only mean that business directly related to debtors' sale of gasoline and inventory in convenience store operations. The Bank Group states the meaning of Section 2(e)(ii) is understood in a common sense context. Creditors cite from a legal dictionary: "ordinary course of business" is the "transaction of business according to the common usages and customs of the commercial world generally or of the particular community or (in some cases) of the particular individual whose acts are under consideration.... In general, any matter which transpires as a matter of normal and incidental daily customs and practices in business." BLACK'S LAW DICTIONARY 989 (6th ed. 1990).

The Bank Group argues Section 2(e)(ii) captures proceeds that debtors did not obtain as part of their daily business. Normal practices of debtors' business are running convenience stores and selling groceries and gasoline, not generating huge tax refunds and amassing realty proceeds. In short, the language is not ambiguous.

Debtors argue the phrase "ordinary course of business" is ambiguous. They note Citibank has been unable to find a single case that supports its conclusion the term is unambiguous. Debtors argue the term cannot be defined without reference to extrinsic sources. In short, there is nothing in the amended stipulation that can be used to define the phrase. The fact the agreement was extensively negotiated and integrated is not a guarantee of lack of ambiguity.

Debtors argue the phrase must include the many transactions which made up debtors losses, leading to the tax refund. Further, debtors argue they have long been involved in condemnation or sales of retail store sites.

The phrase "ordinary course" is ambiguous within the context of this case. As such, the Court must examine the intent of the parties in negotiating the amended stipulation. Extrinsic or parol evidence will be considered.

## V

■ Debtors offer affidavit testimony that creates, at a minimum, material issues of fact as to what the parties intended. Chief Executive Officer Brown avers it was debtors' intention to pay the Bank Group only proceeds of large-scale asset dispositions, such as the sale of all stores in a particular region or market. He states it was never an automatic policy to replace

stores that were condemned or to earmark proceeds for new or replacement stores. Docket No. 18, pp. 2–3. Given this dispute of extrinsic evidence, summary judgment for Citibank is denied. *Sims Office Supply v. KA–D–KA, Inc. (In re Sims Office Supply)*, 83 B.R. 69, 74 (Bankr.M.D.Fla. 1988).

## VI

Debtors ask the Court to grant their cross-motion for summary judgment because Citibank presented no evidence as to what constitutes the ordinary course of debtors' business.

Debtors are correct that Citibank does not cite facts supporting its view that the intent was that tax refunds and real estate proceeds were outside the ordinary course. Regardless, if debtors are entitled to prevail, their undisputed facts must fit the test for determining whether an event is within their ordinary course.

Neither the Code nor the legislative history offers guidance concerning what constitutes ordinary course of business. *Ragsdale v. The Citizens and Southern National Bank (In re Control Electric)*, 91 B.R. 1010, 1012 (Bankr.N.D.Ga.1988). Courts interpreting the term have established guidelines which are helpful, however. *Burlington Northern Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704 (9th Cir. 1988).

Two tests assess whether a transaction is in the ordinary course. These are the horizontal dimension and vertical dimension tests. *Supra.*

The horizontal dimension test involves an industry-wide prospective in which debtors' business is compared to similar businesses. In this comparison, the issue is whether the transaction is of a type that similar businesses would engage in as ordinary business. This showing ensures neither debtor nor creditor did anything abnormal to gain an advantage over other creditors. The transaction need not be common, it need only be ordinary. A transaction can be ordinary and still occur occasionally. In narrowing the focus, based on the nature of debtors' business, the Court must decide whether a transaction is in the course of debtors' or some other business. *In re Dant & Russell, Inc.*, at 704.

It is axiomatic debtors' rivals must file tax returns. Thus, filing income tax returns is an ordinary part of debtors' business. Debtors have shown they incurred losses in earlier years for which they are presumably entitled to a refund. Debtors also established a substantial portion of the losses is attributable to ordinary business operations, not bankruptcy costs. In short, this transaction is not akin to a manufacturer raising a crop. *Johnston v. First Street Companies (In re Waterfront Companies)*, 56 B.R. 31, 35 (Bankr.D.Minn. 1985). Filing taxes is an ordinary event followed industry-wide by other convenience store companies. Given this, debtors' undisputed facts establish the horizontal dimension test is met as to the tax refunds. Debtors concede filing a bankruptcy case is not an ordinary course event. Where losses are attributable to reorganization costs, that portion of the tax refund should be paid to Citibank.

Debtors established they are now and have previously been involved in sales and condemnation actions. They also established they never had a practice of automatically reinvesting proceeds into a replacement store. Thus, debtors made the showing they did nothing abnormal to gain an advantage over Citibank. Selling stores in lieu of condemnation was a common transaction.

Under the vertical dimension or creditor's expectation test, the transaction is viewed from the vantage point of a hypothetical creditor. It inquires whether the transaction subjects a creditor to economic risks different from those accepted when the credit decision was made.

The touchstone of "ordinariness" is … the parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing, because their objections

**700**

to such transactions are likely to relate to the bankrupt's Chapter 11 status, not the particular transactions themselves. *In re Dant & Russell, supra,* at 705.

The creditor's expectation test is reformulated as the vertical dimension test. Here, debtors' prepetition business is compared to their post-petition transactions.

In the instant case, debtors proved they filed taxes on a regular basis, incurred losses prior to bankruptcy, were involved in sales and condemnation actions, and had no automatic policy of replacing stores. Citibank has presented no evidence debtors have deviated from this course post-petition. Given this, the challenged transactions should be consistent with Citibank's expectations during negotiations of the amended cash collateral stipulation. Debtors have met the vertical dimension test.

### VII

Debtors are granted summary judgment to use tax refunds incurred as a result of losses not attributable to reorganization costs. They are further granted summary judgment as to proceeds from condemnation sales and proceeds from the sale of Store 8820.